# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

ANGIE R.,                                        Case No. 20-cv-1442 (ECW)

       Plaintiff,

v.                                                          **ORDER**

ANDREW M. SAUL,
Commissioner of Social Security,

       Defendant.

---

This matter is before the Court on Plaintiff Angie R.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 13) and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 16). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits.

## I.       BACKGROUND

On December 19, 2016, Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act alleging disability as of June 3, 2016 due to multiple sclerosis ("MS"), myofascial pain, migraines, and sleeping problems.[1] (R. 170, 190.) Her application was denied initially and on reconsideration. (R. 78, 93.) Plaintiff filed a written request for a hearing, and on May 8, 2019, Plaintiff appeared and

---

[1]    The Social Security Administrative Record ("R.") is available at Docket Entry 12.

testified at a hearing before Administrative Law Judge Catherine Ma ("ALJ"). (R. 13, 29.)

The ALJ issued an unfavorable decision on June 25, 2019, finding that Plaintiff was not disabled. (R. 14-23.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of June 23, 2016. (R. 15.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: multiple sclerosis and fibromyalgia. (R. 15.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 16.)

---

[2]     The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) except she has additional limitations.  The claimant can lift/carry/push/pull twenty pounds occasionally and ten pounds frequently.  She can stand/walk six hours in an eight-hour workday.  She can sit for six hours in an eight-hour workday.  The claimant can have frequent exposure to extreme cold.  She can never have exposure to extreme heat.  The claimant can never climb ladders, ropes, or scaffolds.  She can never have exposure to hazards such as unprotected heights, dangerous machinery, or commercial driving.

(R. 17.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert, that Plaintiff could perform her past work as an IT consultant/analyst (DOT Code 032.262-010); project management (DOT Code 189.117-030); and contract administration/consultant (DOT Code 119.267-018).  (R. 20-21.)  The ALJ also determined, in the alternative, that given Plaintiff's age, education, work experience, and residual functional capacity, there were other jobs that exist in significant numbers in the national economy that she also could perform, including work as an office cleaner (DOT Code 323.687-014); cashier (DOT Code 211.462-010); and wireworker (DOT Code 728.684-022).  (R. 22.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 23.)

Plaintiff requested review of the decision.  (R. 1.)  On April 29, 2020, the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II. RELEVANT RECORD

### A. Medical Record

Plaintiff was seen on June 3, 2016 with respect to her MS. (R. 275.) While Plaintiff reported stressors pertaining to employment and marriage, the psychological assessment at that time showed no anxiety or depression. (R. 276, 278.)

On July 6, 2016, Plaintiff claimed difficulty with fatigue and alertness related to her MS involving hypersomnia. (R. 318, 320.) Her mental health evaluation showed that Plaintiff was oriented to time, place, and person, and she showed a normal mood and affect. (R. 321.)

A September 19, 2016 mental status examination demonstrated that Plaintiff was "awake and alert; oriented to time/place/person, speech showed normal fluency; syntax and comprehension, intact recent and remote memory; attention span and concentration; language and fund of knowledge." (R. 524.)

On September 28, 2016, Plaintiff reported fatigue, which involved impaired memory or concentration. (R. 329.) Specifically, Plaintiff's reported memory issues included difficulty concentrating, difficulty organizing thoughts, and feelings of mental fogginess. (R. 329.) Plaintiff endorsed symptoms relating to irritability. (R. 329.) It was noted that Plaintiff had no mental health diagnoses, treatment, or medication outside of seeing a marriage therapist. (R. 329.) There was no mental health diagnosis provided for Plaintiff. (R. 335.)

On October 28, 2016, Plaintiff was seen again for a follow-up related to her MS. (R. 519.) While Plaintiff complained of difficulty concentrating, her neurological examination showed that Plaintiff was alert, attentive, oriented, and cooperative; she was a good historian; and her affect and mood appeared stable. (R. 521.)

On November 2, 2016, Ralph Shapiro, M.D., saw Plaintiff in relation to her MS, during which Plaintiff professed no anxiety, depression, memory loss, or panic attacks. (R. 288.)

On November 14, 2016, Plaintiff was seen in part for her chronic headaches, fibromyalgia, and chronic pain. (R. 338.) Plaintiff endorsed the following mood-related symptoms: fatigue/decreased energy, poor quality sleep, decreased appetite, weight loss of 10 lbs. in the last 2 months, feeling worthless or guilty, decreased libido, decreased short-term memory, and depression. (R. 338.) Plaintiff claimed stress related to her condition, but that she coped with this by spending time alone, spending time with family and friends, spirituality, breathing, and diversion. (R. 343.) The mental health status evaluation for Plaintiff was as follows:

> Mrs. [R.] was pleasant and cooperative during interview. Eye contact was direct. Speech was of normal rate and tone; conversation was circumstantial. She verbalized orientation to date, person, and place. Memory appeared normal as evidenced by accurate account of medical history. Mood was anxious and the affect was congruent. There was no evidence of disorder in thought, form, or content. This was evidenced by clear and consistent ideation and thought process. Fund of knowledge appears appropriate for level of education, age, and life experience. Abstract reasoning and judgment appeared intact.

(R. 344.)

On November 15, 2016, Plaintiff was seen for pain rehabilitation. (R. 351.)

Plaintiff noted no past psychiatric history. (R. 354.) The examination of Plaintiff

showed that she:

> was alert and fully oriented with appropriate grooming and hygiene. She
> maintained eye contact. She was cooperative and engaging. Her speech was
> of normal rate, rhythm, and volume with appropriate use of language. Her
> mood was subdued. Her affect was restricted, anxious. Thought processes
> were linear without formal thought disorders. No signs of delusions. No
> signs of hallucinations. Cognition, memory were grossly intact. Attention,
> concentration grossly intact. She had fair insight and judgment and revealed
> motivation to engage in PRC programming and follow treatment
> recommendations. She indicated fleeting passive death [sic] with in setting
> of pain and associated symptoms. She denied specific plan or intent to act
> on her thoughts and denied a history of suicidal behavior.

(R. 354.) There was no mental health diagnosis for Plaintiff, but there was a

recommendation for a psychometric assessment to evaluate mood, cognition, and the

impact of pain on her level of functioning and monitoring and treating her mood/anxiety

as clinically indicated. (R. 355.)

On November 25, 2016, Plaintiff underwent another evaluation of her MS. (R.

409.) Dr. Natalie Parks noted that despite having an MS diagnosis going back 20 years,

her neurological examination remained entirely normal. (R. 411-12.) It was noted that

even if her MS was medically confirmed via an MRI, her prognosis was excellent based

on her history of normal examinations. (R. 412.)

Plaintiff participated in a three-week pain rehabilitation program with respect to

her complaint of pain in multiple sites of her body with fatigue. (R. 456.) It was noted

that Plaintiff attended daily group therapy sessions on stress and mood management. (R.

457.) Plaintiff was not on any medication for mood. (R. 457.) During her intake in

November 2016, Plaintiff admitted to no past psychiatric history or hospitalizations, and reported that she did not see a therapist.  (R 342.)  Plaintiff was pleasant and cooperative during the intake interview; eye contact was direct; speech was of normal rate and tone; conversation was circumstantial; her memory appeared normal; her mood was anxious; her affect was congruent; there was no evidence of disorder in thought, form, or content; and her abstract reasoning and judgment appeared intact.  (R. 344.)  Throughout her group therapy sessions, Plaintiff was largely described as having calm mood, a congruent/neutral affect, an organized thought process; she demonstrated active listening; and she was attentive.  (*See*, *e.g.*, R. 370-88, 392, 394, 397, 401-03, 420-24, 432.)

Based on the Plaintiff's responses on the Patient Health Questionnaire (PHQ-9) upon admission to the Pain Rehabilitation Program, she scored 15 on this measure (range 1 to 27), suggesting the presence of moderately severe (15-19) depressive symptomatology.  (R. 458.)  Upon dismissal, Plaintiff scored 10 on this measure, indicating moderate (10-14) depressive symptomatology.  (R. 458.)  This represented a decrease in depressive symptomology compared to admission.  (R. 458.)

It was also noted that Plaintiff had reported no psychiatric history or hospitalizations.  (R. 460.)  Her mental status examination as of her December 7, 2016 dismissal from the pain rehabilitation program was as follows:

> On dismissal, [Plaintiff] was pleasant and cooperative.  Eye contact was direct.  Speech was of normal rate and tone; conversation was focused on topic.  She verbalized orientation to date, person, and place.  Memory appeared normal as evidenced by accurate account of medical history.  Mood was euthymic and the affect was congruent.  There was no evidence of disorder in thought, form or content.  This was evidenced by clear and consistent ideation and thought process.  Fund of knowledge appears

appropriate for level of education, age, and life experience. Abstract reasoning and judgment appeared intact.

(R. 460.)

On December 13, 2016, Plaintiff complained of difficulty with concentrating and was started on a trial of Adderall. (R. 516-17.) Her neurologic examination indicated that Plaintiff was: Alert and oriented x 3; and her speech showed normal fluency, syntax, and comprehension. (R. 517.)

On January 26, 2018, Plaintiff was seen for an illness. (R. 1349.) As part of the psychiatric examination, Dr. Boris Gerber found that Plaintiff was alert and oriented with normal affect and insight. (R. 1351.) Plaintiff had similar findings on numerous dates during the period of November 2017 through March 2019. (*See, e.g.*, R. 1342, 1359, 1367, 1383, 1397, 1431, 1483, 1486, 1489, 1493, 1506, and 1518.) In addition, at her September 25, 26, and 27, 2018 medical examinations, Plaintiff noted that she had no issues with anxiety or depression, and her examination showed that she was alert and oriented with a normal affect. (R. 1417-22.)

On May 22, 2018, Plaintiff represented that excessive fatigue, which was believed to be secondary to her MS, was the most limiting factor in allowing her to be able to return to any meaningful employment. (R. 1495.) On September 25, 2018, it was noted that Plaintiff had no issues with anxiety or depression. (R. 1417.)

On January 19, 2019, Plaintiff's treating provider Angela Borders-Robinson, D.O., filled out a Multiple Sclerosis Medical Source Statement in which she asserted that Plaintiff's symptoms included mental fatigue, impaired attention, and impaired

concentration, but that she did not show signs of impaired memory, impaired judgment, mood swings, depression, emotional liability, personality change, or confusion.  (R. 1476.)  Dr. Robinson also opined that emotional factors did not contribute to the severity of Plaintiff's symptom and functional limitations.  (R. 1478.)

**B.      Plaintiff's Testimony Before the ALJ**

At the hearing before the ALJ, in response to the ALJ's question asking why she had been unable to work since June 3, 2016, Plaintiff testified in part as follows:

> Q      Okay, so Mr. or Ms. [R.], then let me ask you why have you been unable to work, and if you can please explain in your own words since June 3rd of 2016?
>
> A      Sure.  I've, I've been well motivated to continue to work and use my degree so I've, I've spent a lot of time managing symptoms over the years and just modifying as needed.  But in, in 2016 when I stopped working the hypersomnia that I have as a result of MS worsened and the medication that I was taking at the max dose was no longer effective for it.  And it, I had already been struggling at home with the family, they were concerned that I had no energy because of fatigue and sleepiness both to do anything but work and while I was considering those problems at home I took my medication and I drank a good amount of coffee and I geared up to continue working and go to work and I dozed at the steering wheel again on my way to work.  And at that point the doctors tried different medications and we ended up back to the same medication and my boss allowed me to work from home quite a lot, which was really wonderful, but in the end along with all of the pain and sleepiness and fatigue and sleepiness, the fatigue being muscle fatigue, especially of my neck.  And it, it became too difficult to manage working eight hours a day and I wanted to continue to seek treatments that might work but I found that my case, my medical case is very complicated and it became increasingly more of a job just to manage that medical case for myself and all of the symptoms.  And I was very hopeful that we could find some therapies that worked that would allow me to go back to work but we haven't found any and even up until this week my neurologist have nothing left for me to try other than to manage a very high level of pain as it is, and just manage through the physical difficulties and limitations that I have.

Q      I see.

A      Did that answer your question?

Q      I'm, I'm, well, it did generally but I'm trying to figure out how this, you know, the MS how does it affect you? I understand the, the fatigue but do you also have like flare up, is this based on flare ups as well or?

A      Yes. My MS is relapsing and remitting, it's still actively doing damage that we can see on MRI and, and then also with in that heat and cold both bother me, in addition too I have some times generally worsening of old symptoms so how, how do I describe, I have a lot of chronic symptoms but they change, you know, they, they have kind of some partially predictable curves based off of severity, based off of the treatments that I do, which are nerve blocks and injections and the trigger points and medications and pain relievers. And then, you know, physical conditioning and keeping active as is also something that I struggle with, in general I know I need to do that to keep the MS from growing and getting worse but I also struggle with doing it because I can't get to the level of physical activity that the doctors want me to be at as well for, just for general health. So yeah, it is, it is different every day, I don't know –

(R. 42-44.)

## III.   <u>LEGAL STANDARD</u>

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—

and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (marks and citation omitted). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). Assessing and resolving credibility is a matter properly within the purview of the ALJ. *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV. <u>DISCUSSION</u>

Plaintiff makes the following argument for remand to the ALJ:

Issue: Social Security requires ALJs to use a specific process for evaluating mental limitations. The Eighth Circuit has found it is harmful error to omit recording the process when a claimant has mental limitations arising from a neurological disorder instead of a mental health disorder. Do those rules

> apply to [R.'s] mental limitations arising from her neurological disorder, multiple sclerosis?
>
> The rules should apply to [R.'s] limitations. The ALJ's failure to use the Psychiatric Review Technique (PRT) to evaluate [R.'s] mental impairments was a harmful error.

(Dkt. 14 at 7-8.) According to Plaintiff, a PRT is used to determine severity at step two and whether a listing is satisfied at step three, and that the findings in the PRT are then used in shaping the RFC. (*Id.* at 8.)

Defendant counters that MS does not require a PRT because MS is a physical, neurological condition. (Dkt. 17 at 7-8.) Defendant also notes that Plaintiff did not allege or establish a severe mental medical condition, and therefore the ALJ did not need to use a PRT. (*Id.* at 9-11.)

At the second step of the analysis, the SSA considers "the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). It is a claimant's burden to demonstrate a severe medically determinable impairment at step two of the sequential evaluation, but that burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant. *See Kirby v. Astrue*, 500 F. 3d 705, 707-08 (8th Cir. 2007) (citations omitted). An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. *See id.* at 707; 20 C.F.R. § 404.1520(c). The severity showing "is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." *Kirby*, 500 F.3d at 708 (citations omitted). In determining the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ must use the analysis

described in 20 C.F.R. § 404.1520a.  *See Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th

Cir. 2013).  The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and

laboratory findings to determine whether [the claimant has] a medically determinable

mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1).  The ALJ "must then rate the

degree of functional limitation resulting from the impairment(s)" in four broad functional

areas: (1) understand, remember, and apply information; (2) interact with others;

(3) concentrate, persist, maintain pace; and (4) adapt or manage oneself.  *See id.*

§ 404.1520a(b)(2), (c)(3).  The criteria are rated using a five-point scale of none, mild,

moderate, marked, and extreme.  *See id.* § 404.1520a(c)(4).

Both parties cite to the Eighth Circuit decision in *Cuthrell*, *supra*, in support of

their respective positions as to whether a PRT was required in this case.  In *Cuthrell*, the

plaintiff was in a number of accidents, which resulted in a head injury.  702 F.3d at 1115.

The ALJ found that Cuthrell had two severe impairments: a history of injury to the right

leg and of a closed head injury.  *Id.* at 1116.  The ALJ ultimately found Cuthrell not

disabled and denied benefits.  *Id.*  On appeal, Cuthrell argued in part that the ALJ erred

because a PRT was not performed.  *Id.*  The Eighth Circuit noted that:

> An additional "special technique" (the PRT) is required in evaluating
> "mental impairments." 20 C.F.R. §§ 404.1520a(a); 416.920a(a).  **When
> mental impairments are present, the PRT is mandatory**.  *Id.* ("[W]hen
> we evaluate the severity of mental impairments . . . we must follow a special
> technique at each level in the administrative review process."); *Nicola v.
> Astrue*, 480 F.3d 885, 887 (8th Cir. 2007).  The PRT must be documented in
> the ALJ's written decision, including the findings and conclusions based on
> the PRT.  §§ 404.1520a(e)(4); 416.920a(e)(4).

*Id.* at 1117 (emphasis added). The Commissioner in *Cuthrell* argued that a PRT was not required because Cuthrell's head injury was not a mental impairment. *Id.* In *Cuthrell*, the ALJ, in conducting his analysis of the evidence, noted that a provider found that the claimant had dementia due to a closed head injury with impaired memory, concentration, and motor function, as well as a mood disorder. *Id.* at 1117. The Eighth Circuit acknowledged the difficulty in that case because there was no specific listing for the head injury:

> As the Regulations do not define "mental impairment," the Commissioner's Listing of Impairments assists in classifying injuries. *See* 20 C.F.R. pt. 404, subpart P, app. 1.1. **The Commissioner is correct that neurological impairments are distinct from mental impairments**. *Compare id*. § 11.00 ("Neurological"), *with* § 12.00 ("Mental Disorders"). The term "closed head injury" does not appear in the Listing. The closest listing, "traumatic brain injury," is in the Neurological Listing. *Id*. § 11.00(F). The listing indicates that traumatic brain injury "may result in neurological and mental impairments," and prescribes the use of § 11.18 ("Cerebral Trauma") for direction. The listing for cerebral trauma has one line: "Evaluate under the provisions of 11.02, 11.03, 11.04, and 12.02, as applicable." *Id.* § 11.18. Thus, cerebral trauma, or traumatic brain injury, can be either neurological (11.02, 11.03, 11.04), mental (12.02), or both.

*Id.* (emphasis added).

Because traumatic brain injury can result in mental impairments, the Eighth Circuit court looked to § 12.02 ("Organic Mental Disorders"), which was present in the listing at that time.[3] *Id.* Based on Listing 11.18 and the ALJ's recitation of a provider's findings that Cuthrell had "dementia due to a closed head injury with impaired memory, concentration and motor function and a mood disorder[,]" the Eighth Circuit concluded

---

[3] The Court notes that the present version of Listing 12.02 deals with neurocognitive disorders.

based on § 12.02 (which was to be considered under the then-existing Listing 11.18) that Cuthrell suffered from a severe mental impairment and as a result the ALJ erred by not completing any part of the PRT. *Id.* at 1117-18.

In this case, the ALJ found as follows with respect to steps two and three of the sequential analysis:

> **3.** **The claimant has the following severe impairments: multiple sclerosis and fibromyalgia (20 CFR 404.1520(c)).**
>
> The above medically determinable impairments have imposed more than minimal limitations on the claimant's ability to engage in basic work-related activities for at least a continuous twelve month period, as required by SSRs 85-28 and 16-3p.
>
> Conversely, the claimant has sought treatment for a number of additional conditions, but these impairments do not cause more than minimal limitations in her ability to perform basic work-related activities for twelve continuous months (20 CFR 404.1522; SSRs 85-28; 16-3p). For instance, the claimant alleged migraines and asthma as disabling impairments (Hearing testimony; Exhibit 2E/2). However, numerous medical professionals determined her migraines and mild intermittent asthma were stable with conservative treatment like occipital nerve blocks, Imitrex, and albuterol (Exhibits 2F/10, 23, 28, 37; 7F/72; 8F/8; 15F/7-8, 38). Physical examinations also routinely revealed she had clear lungs with no wheezing, rhonchi, rales, respiratory distress, or neurologic deficits (Exhibits 2F/26, 36; 3F/23, 30, 33; 7F/74; 15F/7, 15, 32, 90, 107).
>
> Because treatment notes mentioned she had undergone a sleeve gastrectomy prior to the alleged onset date and lost 100 pounds, I evaluated whether the claimant's body habitus adversely affected the claimant's ability to perform basic work-related activities pursuant to SSR 19-2p (Exhibit 3F/22). While she had a Body Mass Index (BMI) ranging from 33.39 kg/m2 to 34.64 kg/m2 during the period at issue, she often denied symptoms such as chest pain and shortness of breath (Exhibits 2F/25, 35; 3F/8, 22; l0F/6; 15F/32). Additionally, the claimant's pulses remained normal, she usually did not have lower extremity edema, she was able to walk on her heels and toes, and she could ambulate with a normal gait during evaluations (Exhibits 3F/23, 70; 4F/3, 7, 14; 5F/7, 11, 18, 23, 26, 29, 34; 7F/66; l0F/7; 15F/24, 32, 40; l 7F/14). As such, while the claimant's obesity could be expected to exacerbate

symptoms such as headaches and shortness of breath, I find the claimant's obesity does not cause more than minimal limitations in her ability to engage in basic work-related activities.

Therefore, I find that these impairments were medically treated, not durational, and/or no longer substantially interfere with her ability to function on a daily basis. As such, I find them to be nonsevere impairments. Nevertheless, I have considered the combined effects of the severe and nonsevere impairments in assessing the claimant's functional capacity pursuant to 20 CFR 404.1523.

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

Based on the evidence in the record, none of the claimant's impairments, either singly or in combination, medically meets or equals any of the Listed Impairments contained in 20 CFR Part 404, Subpart P, Appendix 1. No treating, examining, or consulting physician has identified findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to any listed impairment (e.g., Exhibits 1A; 2A; 4A; 6A).

Specifically, even though the claimant's representative argued she meets or equals Listing 11.09 for multiple sclerosis, I find that this condition does not meet or medically equal this listing. Contrary to her hearing testimony that she has trouble with balance and using her arms, there is no evidence of disorganization of motor function of two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or using the upper extremities. Healthcare providers overwhelmingly determined her gait, heel/toe/tandem walk, squatting and rising, balance, and coordination were all within normal limits (Exhibits 3F/43, 70; 4F/3, 7, 14; 5F/7, 11, 18, 23, 26, 29, 34; 7F/66; 8F/5, 70; 10F/7; 14F/l; 15F/24, 32, 40, 48; 17F/4, 14, 17, 21, 29). Additionally, as discussed below, she does not have marked limitation in physical functioning. There is also no evidence in the record that she has marked limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself even though she alleged significant problems with regard to concentration, comprehension, and handling stress and changes in routine, mental status examinations overwhelmingly yielded unremarkable findings (Hearing testimony; Exhibits 4E/1, 6-7; 4F/2). Medical professionals described her as

pleasant, cooperative, calm, engaging, alert, and oriented with normal mood affect, grooming, hygiene, memory, fund of knowledge, abstract reasoning, thought process, insight, judgment, comprehension, and ability to follow commands (Exhibits 2F/26; 3F/23, 30, 53, 63, 80-81, 84, 88, 94, 129, 139, 143, 152; 4F/7, 10; 5F/7, 14, 34, 57; 7F/56, 66, 74; 10F/10; 15F/7, 15, 24, 91; 1 7F/3-4, 6).

Fibromyalgia is not a listed impairment under 20 CFR Part 404, Subpart P, Appendix 1. However, when evaluated by reference to specific body systems it may affect, the record shows that this impairment does not so impact one of the claimant's body systems as to raise her additional impairments to listing-level severity. Furthermore, although I have considered the impact of SSR 12-2p on the analysis of fibromyalgia as medically determinable impairment, I note that a ruling is not a Listing. As such, I find that the claimant's fibromyalgia has not met the criteria of any of the Medical Listings because there is no Listing for fibromyalgia. However, pursuant to SSR 12- 2p, I evaluated the intensity, persistence, and limiting effects of the claimant's associated symptoms when determining the extent to which the symptoms limit the individual's ability to do basic work activities as discussed at finding five of this decision.

(R. 16-20 (emphasis in original and added).)

As stated previously, the only error raised by Plaintiff was the ALJ's failure to use the PRT with respect to the mental limitations arising from her neurological disorder, MS, which she claims infected the rest of the sequential analysis. (Dkt. 14 at 7-8.) Plaintiff is correct to concede that MS is a neurological disorder. Indeed, Listing 11.09 (multiple sclerosis) falls under § 11.00 Neurological Disorders of the Listings, which provides:

Which neurological disorders do we evaluate under these listings? We evaluate epilepsy, amyotrophic lateral sclerosis, coma or persistent vegetative state (PVS), and neurological disorders that cause disorganization of motor function, bulbar and neuromuscular dysfunction, communication impairment, or a combination of limitations in physical and mental functioning. We evaluate neurological disorders that may manifest in a combination of limitations in physical and mental functioning. For example, if you have a neurological disorder that causes mental limitations, such as

Huntington's disease or early-onset Alzheimer's disease, which may limit executive functioning (e.g., regulating attention, planning, inhibiting responses, decision-making), we evaluate your limitations using the functional criteria under these listings (see 11.00G).  Under this body system, we evaluate the limitations resulting from the impact of the neurological disease process itself.  **If your neurological disorder results in only mental impairment or if you have a co-occurring mental condition that is not caused by your neurological disorder (for example, dementia), we will evaluate your mental impairment under the mental disorders body system, 12.00**.

*See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00(A)[4] (emphasis added).  Accordingly, Listing 11.00(A) makes clear the Commissioner will normally consider any mental limitation (e.g., regulating attention) caused by the neurological disorder under § 11.  *Id.* ("[I]f you have a neurological disorder that causes mental limitations . . . which may limit executive functioning (e.g., regulating attention, planning, inhibiting responses, decision-making), we evaluate your limitations using the functional criteria under these listings (*see* 11.00G).  Under this body system, we evaluate the limitations resulting from the impact of the neurological disease process itself.").  Only if the only impairment is mental, or if the mental condition is independent of the neurological condition, will the Commissioner consider such mental limitations under § 12.00 ("Mental Disorders").  *Id.* ("If your neurological disorder results in only mental impairment or if you have a co-occurring mental condition that is not caused by your neurological disorder (for example, dementia), we will evaluate your mental impairment under the mental disorders body

---

[4]     The Court relies on the listings in effect at the time of the Commissioner's decision as to Plaintiff's claim.  *See Lerouge v. Saul*, No. 4:19-CV-00087-SPM, 2020 WL 905756, at *8 (E.D. Mo. Feb. 25, 2020) (citing Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048, 43051 n.6 (July 1, 2016)).

system, 12.00.").  Listing 11.00(G) explains that: "Neurological disorders may manifest in a combination of limitations in physical and mental functioning.  We consider all relevant information in your case record to determine the effects of your neurological disorder on your physical and mental functioning" and what is required to satisfy 11.00(G).  *See id.* § 11.00(G).  Again, only if "you do not have at least a marked limitation in your physical functioning" does the Commissioner evaluate the claimant under the Listings in § 12.  (*Id.*)

As to MS specifically, Listing 11.00(N) explains how MS is evaluated under Listing 11.09, including a claimant's mental functioning:

> We evaluate your signs and symptoms, such as flaccidity, spasticity, spasms, incoordination, imbalance, tremor, physical fatigue, muscle weakness, dizziness, tingling, and numbness when we determine your ability to stand up, balance, walk, or perform fine and gross motor movements.  When determining whether you have limitations of physical and mental functioning, we will consider your other impairments or signs and symptoms that develop secondary to the disorder, such as fatigue; visual loss; trouble sleeping; impaired attention, concentration, memory, or judgment; mood swings; and depression.  If you have a vision impairment resulting from your MS, we may evaluate that impairment under the special senses body system, 2.00.

*See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00(N)(2).

Here, Plaintiff takes the position that because Listing 11.09 for MS specifically sets forth that it can cause limitations of mental function and contains a section mirroring the PRT, it should be treated the same as Listing 11.18 for traumatic brain injuries was

treated by the Eighth Circuit in *Cuthrell*, and consequently, a PRT is required.[5] (Dkt. 14 at 11.)

This argument ignores critical differences in the Listings at issue in *Cuthrell* and those at issue here. While it is not entirely clear when the Commissioner in *Cuthrell* issued the decision on benefits, the version of Listing 11.18 in effect at that time provided in its entirety: "Evaluate under the provisions of 11.02, 11.03, 11.04 and 12.02, as applicable." *See*, *e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.18 (*effective* February 2, 2009 to November 4, 2009); *see also Cuthrell*, 702 F.3d at 1117 ("The listing for cerebral trauma has one line: 'Evaluate under the provisions of 11.02, 11.03, 11.04, **and 12.02**, as applicable.'") (emphasis added) (citation omitted). What was critical for the Eighth Circuit in *Cuthrell* was the fact that Listing 11.18 specifically required the Commissioner

---

[5]     Plaintiff appears to be relying on the present version of Listing 11.18:

11.18 Traumatic brain injury, characterized by A or B:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury:

    1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    2. Interacting with others (see 11.00G3b(ii)); or
    3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.18.

to evaluate under Listing 12.02 for organic mental disorder. Here, Listing 11.09, reproduced below, does not require any evaluation under any Listing in § 12:

11.09 Multiple sclerosis, characterized by A or B:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.09.

Rather, in contrast to the version of Listing 11.18 in effect in *Cuthrell*, the current Neurological Listings provide that the Listings in 12.00 are not even considered in connection with neurological disorders (including MS) unless a mental impairment is the only impairment or if the mental condition is independent of the neurological condition, neither of which Plaintiff contends is the case here. Accordingly, *Cuthrell* does not require the conclusion that a PRT is required here.

The Court notes that the Listings in § 12.00 do provide that neurocognitive disorders stemming from MS might, under certain circumstances, be evaluated under Listing 12.02, as set forth below:

**B. Which mental disorders do we evaluate under each listing category?**

1. Neurocognitive disorders (12.02).

   a. These disorders are characterized by a clinically significant decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

   b. Examples of disorders that we evaluate in this category include major neurocognitive disorder; dementia of the Alzheimer type; vascular dementia; dementia due to a medical condition such as a metabolic disease (for example, late-onset Tay–Sachs disease), human immunodeficiency virus infection, vascular malformation, progressive brain tumor, **neurological disease (for example, multiple sclerosis**, Parkinsonian syndrome, Huntington disease), or traumatic brain injury; or substance-induced cognitive disorder associated with drugs of abuse, medications, or toxins. **(We evaluate neurological disorders under that body system (see 11.00).** We evaluate cognitive impairments that result from neurological disorders under 12.02 if they do not satisfy the requirements in 11.00 (see 11.00G).)

   c. This category does not include the mental disorders that we evaluate under intellectual disorder (12.05), autism spectrum disorder (12.10), and neurodevelopmental disorders (12.11).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(B) (emphasis added).

But Plaintiff did not argue to the ALJ (and has not argued here) that she is suffering from neurocognitive disorder as the result of her MS or that she should have been evaluated under Listing 12.02, and nothing in the record indicates any neurocognitive disorder that would require evaluation under the Listings in § 12. Rather than directing the Commissioner to consider § 12 when evaluating MS, § 11 makes clear that § 12 is only considered under certain circumstances—which are not alleged to be present here. Boiled down to essentials, Plaintiff's argument appears to that because

Listings 11.00(N) and 11.09 take into account her mental functioning, such as concentration, and the record contains evidence of her decreased mental functioning, the ALJ should have conducted a PRT consistent with 20 C.F.R. § 404.1520a.[6] However, this is contrary to § 404.1520a and conflates the steps required in the analysis. *See Virnig v. Colvin*, No. 13-CV-1539 PJS/TNL, 2014 WL 3864431, at *9-10 (D. Minn. Aug. 6, 2014) ("The first step requires evaluation of the pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ must document, in a written decision, the special technique for analyzing the impairment."). Section 404.1520a first requires an ALJ to "evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). Only when a medically determinable mental impairment is identified must an ALJ "then rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: (1) understand, remember, and apply information; (2) interact with others; (3) **concentrate**, persist, maintain pace; and (4) adapt or manage oneself." *See id.* § 404.1520a(b)(2), (c)(3) (emphasis added).

Plaintiff points to the opinions of treating neurologist Dr. Borders-Robinson as "endors[ing]" her symptoms of fatigue, visual loss, trouble sleeping, impaired attention,

---

[6] The Court notes that Plaintiff does not even contest the ALJ's finding that she did not have a marked limitation in physical functioning so as to necessitate an examination on her functioning under § 11.09(B)(1)-(4). (R. 16-17.)

concentration, and memory.  (Dkt. 14 at 11.)  There is nothing in that opinion that indicates those symptoms resulted from a medically determinable mental impairment, such as depression or anxiety.  To the contrary, Dr. Borders-Robinson represented that emotional factors **did not** contribute to the severity of Plaintiff's symptoms and functional limitations.  (R. 1478.)  Plaintiff also points to the January 9, 2019 consultation with Dr. Borders-Robinson.  (Dkt. 14 at 11.)  Again, there is nothing in that record that Plaintiff's function is due to any mental impairment.  Instead, Dr. Borders-Robinson provides, "The steroids also help to improve her excessive daytime fatigue.  This is her main limiting factor for work ability.  Although she has got some cognitive slowing it is **mainly impacted by her excessive daytime fatigue**."  (R. 1485 (emphasis added).)  Moreover, the psychiatric examination by Dr. Borders-Robinson for Plaintiff was normal.  (R. 1486.)  The assessment for Plaintiff relating to MS was "excessive disabling fatigue secondary to relapsing multiple sclerosis."  (R. 1487.)  In other words, it is the fatigue from her MS that was the cause of Plaintiff's purported cognitive difficulties, as opposed to any mental condition.  Similarly, the only impairment discussed in the May 22, 2018 report from Dr. Borders-Robinson, also relied upon by Plaintiff (Dkt. 14 at 11), was fatigue secondary to MS.  (R. 1495.)  Indeed, Plaintiff acknowledged in her testimony before the ALJ that her impediment was her fatigue.  (R. 42-44.)  While "a mental impairment may cause fatigue," SSR 96-8p, 1996 WL 374184, at *6, as opposed to the physical fatigue posed by MS, Plaintiff has not even identified what mental impairment she was suffering from during the relevant period, and the record contains no diagnosis as to any mental illness.  To the extent Plaintiff suffered from difficulties with concentration

and attention due to physical fatigue caused by her MS, the ALJ properly evaluated those symptoms under § 11.

As stated previously, based on Listing 11.18 (incorporating § 12.02) and the ALJ's findings that Cuthrell had "dementia due to a closed head injury with impaired memory, concentration and motor function and a mood disorder[,]" the Eighth Circuit concluded that Cuthrell suffered from a severe mental impairment and as a result the ALJ erred by not completing any part of the PRT. *See Cuthrell*, 702 F.3d at 1117-18. Here, unlike the ALJ in *Cuthrell*, there was no such finding by the ALJ of any mental disorder or severe mental impairment that triggered the need to complete a full PRT. In sum, because substantial evidence in the record supports the finding that Plaintiff did not suffer from a medically determinable mental impairment, the Court finds that the ALJ did not err in failing to conduct a PRT at step two, or if there was an error that it was harmless.[7] *See Cuthrell*, 702 F.3d at 1118.

---

[7]     The Court notes that Plaintiff also argued that the:

> ALJ's conclusion that [R.] could still perform her highly skilled past work was incongruous with the evidence. [R.'s] employer made numerous accommodations to keep her and she had earned her master's degree just two years prior to stopping work. It doesn't make sense, unless you factor in the ALJ's error at step 2 and the subsequent reliance on the erroneous finding. If [R.] had no problems at all with the mental requirements of work, then she could have returned to her past work.

(R. 13-14.) Even assuming that this is correct, this argument ignores the fact that the ALJ found that Plaintiff, based on the VE's testimony, could perform her past work generally **and** as actually performed (R. 21) and that a "VE can consider the demands of the claimant's past relevant work either as the claimant actually performed it or, as here, as performed in the national economy." *Wright v. Astrue*, 489 F. App'x 147, 149 (8th Cir. 2012) (citing 20 C.F.R. § 404.1560(b)(2))

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     Plaintiff Angie R's Motion for Summary Judgment (Dkt. 13) is **DENIED**;

and

2.     Defendant Commissioner of Social Security Andrew Saul's Motion for

Summary Judgment (Dkt. 16) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED: July 14, 2021                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

---

(citations omitted).  Moreover, the argument ignores the ALJ's alternative finding
that Plaintiff, based on her RFC and the testimony of the VE, could perform jobs
that exist in significant numbers in the national economy.  (R. 22.)